UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Clara Alisa Bennett, | ) | Civil Action No. 5:21-00337-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | ORDER |
| | ) | |
| vs. | ) | |
| | ) | |
| Kilolo Kijakazi,[1] Acting Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil

Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

Complaint. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a

final decision the Commissioner of Social Security ("Commissioner"), denying her claim for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the

Social Security Act ("the Act"). The issues before the court are whether the decision is supported by

substantial evidence and whether the Commissioner's decision contains an error of law. For the

reasons that follow, this court affirms the Commissioner's decision.

I.     Relevant Background

       A.  Procedural History

       Plaintiff protectively filed applications for DIB and SSI on May 1, 2019, alleging disability

due to fibromyalgia, bipolar disorder, post-traumatic stress disorder ("PTSD"), severe anxiety, severe

depression, degenerative disc disease in her neck, carotid artery calcification, colon cancer, H. Pylori,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security in July 9, 2021. Commissioner Kijakazi is hereby substituted for the former Commissioner, Andrew Saul, as the named defendant in this action. *See* 42 U.S.C. § 405(g), Fed. R. Civ. P. 25(d).

constant diarrhea, nausea, fatty liver disease, extreme cramps, constant memory loss, and emotional disorders. Tr. 85, 266-269. Plaintiff alleges a disability onset date of March 26, 2014. Tr. 85, 173, 276.

At the hearing, Plaintiff's onset date was amended to September 27, 2018. Tr. 36-37. Her applications were denied initially, Tr. 85-126, and upon reconsideration, Tr. 131-186. Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), Tr. 197-198, and on September 28, 2020, a hearing was held before an ALJ at which Plaintiff and a vocational expert ("VE") testified. Tr. 33-54. On October 15, 2020, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 10-22. Plaintiff requested a review of the decision by the Appeals Council, and on December 4, 2020, the Appeals Council denied the request for review, making the ALJ's October 15, 2020 decision the final decision of the Commissioner for purposes of judicial review. Tr. 1-9. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on February 3, 2021. ECF No. 1.

    B. Plaintiff's Background

Plaintiff was born on January 23, 1964 and was 54 years old on her alleged onset date. Tr. 20, 250. In her Disability Report-Adult form, Plaintiff indicated that she obtained her G.E.D. in May of 1982. Tr. 268. Plaintiff is able to read, write and understand English. *Id.* at 266. Plaintiff did not attend special education classes or complete any type of specialized job training. *Id.* Plaintiff indicated she stopped working on March 26, 2014 due to her conditions. Tr. 267-68. Plaintiff's most recent employment was as a cashier in retail; however, she previously worked as a fast-food cashier and a scale clerk at a recycle yard. Tr. 268. Plaintiff indicates that she was in the military from December 7, 1982 until October 10, 1988. Tr. 251.

### C.   The Administrative Hearing

On September 28, 2020, Plaintiff appeared via telephone with counsel at an administrative hearing before an ALJ in Myrtle Beach, South Carolina. Tr. 38. VE Alexandria Bergman also appeared. *Id.*

#### 1.   Plaintiff's Testimony

Plaintiff testified that she did "not have an education" and classified her work history as "manual labor." Tr. 37.  She testified that she worked at Walmart as a cashier, worked for a heating and air company, and worked for Williams Properties, a rental company. Tr. 37-38. Plaintiff testified that while working for the rental company, she refinished floors and did some painting.  Tr. 38. Plaintiff testified that she can no longer perform lifting or the manual labor she performed in her previous jobs.  *Id.*

Plaintiff testified she no longer works full-time because she is bipolar, has early onset dementia, has back problems, and has degenerative disc disease in her neck that causes tingling in her arms and weakness in her hands.  *Id.* Plaintiff explained that her arms and hands feel half asleep all the time.  *Id.* She testified that she cannot stand or cook meals because of back pain.  *Id.* She explained that when she goes to the grocery store, she has to use the assistance of her walker or the grocery cart for support. *Id.* Plaintiff testified she believes the issues with her arms and hands stem from her neck issues, and she uses a heating pad every day on her neck and back. Tr. 39-40. She testified she is sometimes able to write. Tr. 39.

Plaintiff described her fibromyalgia diagnosis as nerve pain.  Tr. 40.  She testified she has nerve pain all over, and on the day of the hearing was experiencing pain in her neck and down her arms. *Id.* She testified that the pain presents in different places like her hips and knees, radiating down her legs, thereby making it hard for her to walk. *Id.* Plaintiff testified that she also has pain in her knees and hips.  Tr. 41.  She testified that she has undergone six surgeries on each foot, requiring all

3

bones to be broken and tendons attached six different times. *Id.* Plaintiff explained that when she was in grade school, she wore high heels to school every day. Tr. 42. Plaintiff stated that a podiatrist told her that her feet were not "well-enough developed" and it interfered with the bone structure of her feet. *Id.* Plaintiff further indicated that she required the surgery because she failed to get treatment for this disorder, which she had at birth. *Id.* Plaintiff testified that due to the severe pain associated with her foot condition, she cannot stand for long periods of time. Tr. 43. She testified that she soaks her feet every day, but it does not help much. *Id.* She testified that Little River Medical Center prescribed her a walker that she has with her 99% of the time. *Id.*

Plaintiff testified that bipolar disorder and PTSD make it hard for her to think. Tr. 44. She explained that she used to shower every morning, but for the past four to five years she is able to bathe only once or twice a week. *Id.* She testified that these tasks are "hard." *Id.* Plaintiff testified that it is difficult for her to vacuum, and she can "do, like, three or four lifts" but then has to sit down for a while. *Id.* She testified that it takes her three to four days to vacuum her home. *Id.* Plaintiff testified that her depression makes it difficult for her to walk outside, and it is "very emotional for [her] [to] walk outside." Tr. 44-45. Further, she testified that she does not do well being around other people which is why it is difficult for her to go to the grocery store. Tr. 45. When asked whether she self-medicates with alcohol, Plaintiff testified she "did that in March" and confirmed that she was admitted into the hospital in February. *Id.*

Plaintiff testified that she lives in a camper with one cat. *Id.* She testified that her son pays her power bill and phone bill, but it is hard for him to help her because he has his own family. *Id.* She testified that her lease is due in January, and she feels like an extreme burden to her family. Tr. 45-46. Plaintiff characterized her daily routine as follows: it takes her about a half hour to loosen up and get out of bed. Tr. 46. She testified that she feeds her cat on her table to avoid bending over, and she tries watching the morning news and weather. *Id.* She testified that she uses the microwave to

make meals. *Id.* She testified that she cannot lift her cat but sometimes lays on the couch with him. *Id.* She tries to get up and walk a few steps but then sits back down. Tr. 46-47. She testified she does her morning prayers on Facebook.  Tr. 47.  She testified that her most comfortable position is lying in bed on her stomach, trying to roll on her left side, and propping up her right leg for her hip and knee.  *Id.*  Plaintiff testified that this position still hurts but it eases up some. *Id.*

When asked about difficulties in other areas, Plaintiff testified that she does not fix her hair and has not worn makeup for years. *Id.* She explained that it is difficult to perform these tasks because she cannot lift her arms.  *Id.*  Plaintiff testified she had limited vision. *Id.* When asked if she has any friends who live around her, Plaintiff testified she cannot leave the house because it is too stressful, and she fears other people. *Id.* Additionally, she testified that she has had diarrhea since her November 2018 colon cancer diagnosis. Tr. 47-48.  She testified that she has regular panic attacks when she is outside her home and flashbacks from her PTSD. Tr. 48. Plaintiff described the ways in which she copes with panic attacks. Tr. 48-49. Plaintiff testified she struggles with breathing every day and will get really weak, particularly in colder weather. Tr. 49. She testified that she has no energy, and wearing a mask makes her breathing issues worse. Tr. 49-50.

2.  Testimony of the VE

VE Alexandria Bergman also testified at the administrative hearing. Tr. 50. The VE described Plaintiff's past relevant work as cashier II, Dictionary of Occupational Titles ("DOT") number 211.462-010, with a light exertional level, but a medium level as actually performed by claimant, and a SVP of 2; fast food worker, DOT number 311.472-010, with a light exertional level, and a SVP of 2; and a scale clerk, DOT number 221.587-030, light exertional level, with an SVP of 3. Tr. 50. The ALJ asked the VE to assume the following: "a hypothetical individual of the claimant's age, education and work experience who is limited to medium exertional level work," as described by the Social Security Regulations, with the following limitations:

> That individual will be capable of frequent operation of foot controls with the right lower extremity. And could climb ramps and stairs frequently but could not climb ladders, ropes, or scaffolds. The hypothetical person could balance, stoop, kneel, or crouch frequently. But could only occasionally crawl. And the hypothetical person would be capable of frequent overhead reaching and handling bilaterally. And would be capable of far visual acuity and would be limited –the person could not tolerate constant exposure but could tolerate frequent exposure to fumes, odors, dust, gases, or poor ventilation. Limited to simple, routine tasks in an environment with no fast paced strict production demands. And could tolerate occasional contact with supervisors, with coworkers, or the public. And occasional changes in the work setting that would need to be explained in advance.

Tr. 50-51. The VE confirmed that the person could not perform Plaintiff's past relevant work, but identified the following examples of jobs that could be performed: warehouse worker, DOT number 922.687-058, SVP of 2, with approximately 99,000 positions in the national economy; laundry worker, DOT number 361.685-018, SVP of 2, with approximately 443,000 positions in the national economy; and floorwork worker, DOT number 381.687-034, SVP of 2, with approximately 1.3 million positions in the national economy. Tr. 52. The VE further testified that none of Plaintiff's skills from any of her past work would transfer to light or sedentary exertional level positions. Tr. 52. The ALJ asked the VE if her testimony was consistent with the DOT. *Id.* The VE responded affirmatively but noted that the DOT "doesn't specifically address overhead reaching." *Id.* The VE stated that she based her opinion on her training, education, and experience in job placement. *Id.* Plaintiff's attorney explained in closing that Plaintiff would "grid out" on her 55th birthday, and that the prescription for a walker, which was forthcoming, would eliminate most jobs. Tr. 5.

II.    Discussion

    A.  The ALJ's Findings

In his October 15, 2020, decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

6

2.  The claimant has not engaged in substantial gainful activity since September 27, 2018, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: cervical degenerative disc disease; intermittent asthma, chronic obstructive pulmonary disease with tobacco abuse; carpal tunnel syndrome; alcohol abuse disorder; generalized anxiety disorder; posttraumatic stress disorder; and bipolar affective disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: Frequent operation of foot controls with the right lower extremity; frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; stoop, kneel and crouch; occasionally crawl. Frequent overhead reaching with the bilateral upper extremity, frequent handling with the bilateral upper extremity; frequent far acuity in the right eye; frequent exposure to fumes, odors, dusts, gases, and poor ventilation. This person can perform simple, routine tasks in an environment with no fast paced, strict production demands; occasional contact with supervisors, coworkers, and the public; occasional changes in work setting explained in advance.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 23, 1964, and was 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant subsequently changed age category to advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 13-22.

B.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525, § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

prevents claimant from performing past relevant work ("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. §

405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.  Analysis

Plaintiff argues the ALJ failed to explain his findings regarding Plaintiff's residual functional capacity ("RFC") as required by SSR 96-8p and erred in his evaluation of Plaintiff's subjective symptomology. Pl.'s Br. 20-37, ECF No. 15.

1. The ALJ's RFC Assessment

Plaintiff contends the ALJ failed to perform the proper function-by-function analysis of Plaintiff's RFC. Pl.'s Br. 21-22. The Commissioner asserts that substantial evidence supports the ALJ's RFC assessment. Def.'s Br. 7, ECF No. 16.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. An "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. §§ 404.1545(a)(3) and (4), 416.945(a)(3) and (4). Social Security Ruling 96–8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184 at *7. The ALJ must discuss the claimant's ability to "perform sustained work activities in an ordinary work setting" on a regular work schedule. *Id.* Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The ALJ determined Plaintiff had the RFC to perform a range of medium work with some limitations. Tr. 16. Plaintiff argues that within the RFC determination, the ALJ failed to: (1) properly consider her use of an ambulatory assistive device; (2) properly account for Plaintiff's chronic obstructive lung disease ("COPD") or asthma diagnosis; and (3) properly account for her psychiatric disorders. Pl.'s Br. 22-30.

a. ALJ's Consideration of Plaintiff's Use of an Ambulatory Assistive Device

Plaintiff argues that the ALJ erred in finding that Plaintiff could frequently operate foot controls with the right lower extremity, frequently climb ramps or stairs, frequently balance, stoop, kneel, crouch, and occasionally crawl. Pl.'s Br. 22-23. Plaintiff argues that her medical records document issues associated with both chronic foot pain, as well as multiple surgeries on her feet. Pl.'s Br. 23. At the hearing, Plaintiff testified that she cannot stand for a period of time due to extreme pain. Tr. 43. She testified that she was prescribed a walker and had it with her 99% of the time. Tr. 43. Plaintiff further points out that she was prescribed a walker after a physician at Little River Medical Center observed gait abnormalities.[3] Tr. 476. Plaintiff also argues that her medical records indicate that she suffers from pain disorders, including fibromyalgia, and pain that affects her entire body. Pl.'s Br. 23. Plaintiff contends that despite the medical evidence within the record documenting her need for an ambulatory assistive device, as well as her own testimony regarding the same, the ALJ did not account for this limitation or use of a device in his discussion of the RFC finding.

Plaintiff argues that the ALJ relied heavily on a Cooperative Disability Investigation ("CDI")[4] report to determine Plaintiff was often observed walking without an assistive device; however,

---

[3] On October 30, 2018, Plaintiff went to Little River Medical Center to review labs; notes indicate she had requested a prescription for a walker that was given to her at a previous visit on October 12, 2018. Tr. 476. She was prescribed a rolling walker and noted as having gait abnormalities. Tr. 481.

[4] The CDI report, Exhibit B12F, is dated January 24, 2020. Within the synopsis of the report, the investigator states that Plaintiff recently attended a consultative examination where her behavior appeared "questionable" with regard to effort and presentation. Tr. 532, Ex. B12F. Specifically, it states her gait was inconsistent with medical records and reports that she used a walker. *Id.* The report indicates she has a Class D driver's license with no restrictions. Ex. B12F. With respect to observations, on January 2, 2020, a SLED Special Agent obtained video footage from Plaintiff's December 5, 2019 visit to a Walmart. Ex. B12F/8. During that visit, Plaintiff, who was alone, placed items from her push buggy on a counter, and unloaded her items to the front of her car. *Id.* She did not appear to have any back, leg, foot, arm, hand, or finger problems. *Id.* The Special Agent obtained video footage of a December 16, 2019 visit to the same store where similar behavior was observed. Ex. B12F/9. The Special Agent observed video footage from a Food Lion where Plaintiff was able to push a buggy, place bagged items into a buggy, and unload her items in her car. Ex. B12F/10. The Special Agent also visited Pirate Land, where Plaintiff lives, and spoke with a witness. Witness #1

12

Plaintiff argues the report confirmed that Plaintiff was often observed using a cart to shop. Pl.'s Br. 24. Plaintiff argues the ALJ relied heavily on this report without otherwise explaining how the RFC accounts for her lower extremity limitations. *Id.* Plaintiff also argues the ALJ failed to make the required evaluation under SSR 96-9p[5] regarding the circumstances for which the assistive device is needed and consideration of the particular facts of the case. Pl.'s Br. 25. The Commissioner argues that the ALJ discussed evidence throughout the record, aside from the CDI report, supporting a finding that Plaintiff does not always use an assistive device.

After reviewing the ALJ's decision and the multiple records cited by the ALJ in explaining his decision, this court concludes the ALJ did not err in not providing more limitations to account for the use of an ambulatory device. Plaintiff bears the burden to show that her use of an assistive device is medically necessary. *Harris v. Berryhill*, No. 4:17-CV-00041, 2019 WL 1372164, at *3 (W.D. Va. Mar. 26, 2019). SSR 96-9p "requires that there be medical documentation of the *need* for [an assistive

---

states that Plaintiff does not use an assistive device, she is friendly, capable of carrying on conversation, and does not appear to have any physical or visual limitations. Ex. B12F/10. Witness #1 did indicate she had threatened another resident online and has problems controlling her emotions. Ex. B12F/10. On this same day, Special Agent spoke to Witness #2, a Food Lion employee, by phone to request video surveillance of the Food Lion Store. Ex. B12F/11. A few days later, Witness #2 provided the Special Agent with a Food Lion receipt reflecting a purchase at that location. Ex. B12F/14. The Special Agent also visited a Dollar General, and presented a photo of Plaintiff to Witness #3, who was familiar with Plaintiff. B12F/11. Witness #3 indicated that Plaintiff is usually seen once a week without the use of an assistive device and is capable of shopping independently. Ex. B12F/11. Witness #3 further indicated she carries her purchases out and did not appear to have any back, leg, or foot problems. Ex. B12F/11. The Special Agent visited a Circle K, and, after presenting Plaintiff's photo to Witness #4, learned that Plaintiff is usually seen twice every 3 months, and she does not use an assistive device. On January 6, 2020, the Special Agent spoke to another witness, Witness #5, by phone. Witness #5, also of Pirate Land, indicated Plaintiff does not use an assistive device, she has been seen driving a golf cart around the area, and she is fairly friendly, though she reportedly threatened another Pirate Land resident. B12F/13. Witness #5 believes Plaintiff may have mental health issues. B12F/13.

[5] SSR 96–9p explains the policies regarding the capability of a claimant to do other work when the claimant has an RFC for less than the full range of sedentary work. Here, the ALJ assessed Plaintiff with the RFC to perform a reduced range of medium work.

device], not merely the *use* of one." *Id.*(emphasis in original). Regarding exertional limitations, the Ruling provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

SSR 96-9p, at *7.

This court does not agree that based on the entire evidence of record, the ALJ erred in not further limiting the RFC to account for the use of an assistive device. The ALJ carefully reviewed the medical records, as well as other evidence within the record and determined that, while Plaintiff testified regarding a prescribed walker that she used most of the time, she regularly appeared at appointments without an assistive device and was frequently noted to have no gait abnormalities or gait disturbance. Tr. 18-19.

As pointed out by Plaintiff, the ALJ considered the CDI report, dated January 24, 2020, which occurred after an assessment by a consultative examiner raised issues regarding Plaintiff's behavior as inconsistent with her medical records. Ex. B12F. In discussing the CDI report, the ALJ found that the observations of Plaintiff's activities in that report suggest she has greater physical abilities than Plaintiff indicates. Tr. 18. Indeed, the ALJ explained that the CDI report describes several instances where Plaintiff was able to shop alone without abnormal behavior. Tr. 15 (citing Ex. B12F). Within the CDI report, Plaintiff was observed shopping at a Walmart on more than one occasion without the use of an assistance device, and she was able to place items in a grocery cart. Ex. B4A; Ex. B12F. The CDI report also includes testimony from witnesses who either live near Plaintiff or have observed her shopping, who indicate that Plaintiff was not observed needing assistance standing or walking and did not shop with an assistance device. Ex. B4A; Ex. B12F.

In addition to the report, in assessing Plaintiff's functional limitations, the ALJ found Plaintiff reported conflicting information to her medical providers with respect to her ability to stand and walk. Further, not all of her medical providers' findings supported the severity of Plaintiff's allegations. Tr. 16-17. Specifically, the ALJ indicated that despite Plaintiff's testimony at the hearing, held on September 28, 2020, that she used a rolling walker "ninety-nine percent" of the time, she was regularly observed walking without the use of an assistance device. Tr. 17. The ALJ considered evidence in the record wherein Plaintiff often denied gait abnormalities or balance difficulties. Tr. 18. For example, as cited by the ALJ in his decision, Plaintiff denied balance difficulties and gait abnormalities at several appointments at Little River Medical Center, as noted in medical records dated March and April of 2020, as well as in August of 2020. Ex. B13F; Ex. B22F. Again, as cited by the ALJ, on February 14, 2020, Plaintiff presented to Grand Strand Regional Medical Center after an anxiety attack, wherein she denied difficulty walking, though she stated that she normally walks with a walker. Ex. B14F. These records were dated a few months prior to the hearing, where Plaintiff testified that she could not stand or walk without assistance.

The ALJ further considered the physical consultative examination performed by Andrea Pereira on November 2, 2019. At that exam, Dr. Pereira indicated that Plaintiff presented without a walker. Tr. 18 (citing Ex. B10F).[6] Therefore, despite Plaintiff's assertion that the ALJ relied heavily on one CDI report, clearly the ALJ also considered physician's notes within the medical records, as well as Plaintiff's own statements denying gait disturbances.

Therefore, this court finds that the ALJ did not err in failing to consider use of a cane or assistive device when the evidence failed to demonstrate Plaintiff's need for one. *See Chavious v. Berryhill*, No. CV 5:17-2564-BHH, 2019 WL 1232635, at *4 (D.S.C. Mar. 18, 2019) (discussing that

---

[6] The ALJ further noted inconsistencies at this consultative exam between Plaintiff's own testimony regarding vision loss and her denial of vision loss to her medical providers. Tr. 18 (citing Ex. B10F).

SSR 96-9p provides that to find a hand-held assistive device is medically required, there must be medical documentation establishing the circumstances for which it is needed). While there is a medical record indicating Plaintiff was prescribed a walker after she requested one, it is clear from the ALJ's decision that he considered the entirety of Plaintiff's medical records, as well as her testimony, in ultimately assessing her RFC and determining that there is not sufficient medical documentation to support a finding that it is needed. Moreover, Plaintiff was observed on multiple occasions without the use of such device. Accordingly, this court finds the ALJ's assessment of Plaintiff's ability to walk without an assistive device is supported by substantial evidence within the record.

### b. ALJ's Consideration of Plaintiff's COPD or asthma diagnosis

Plaintiff asserts that the ALJ's RFC assessment did not properly account for Plaintiff's issues with COPD or asthma. Pl.'s Br. 27. Plaintiff argues that she was diagnosed with both conditions in October 2018 and has a reported history since the diagnosis of increased wheezing, coughing, or trouble breathing. Pl.'s Br. 27. In response, the Commissioner argues that the ALJ discussed evidence related to these conditions, but ultimately determined these conditions were mild and intermittent. Def.'s Br. 7.

This court does not find that the ALJ erred in his RFC assessment with respect to these conditions. The ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Richardson v. Perales*, 402 U.S. at 399. "[A]n ALJ is not required to provide a written evaluation of every piece of evidence, but need only minimally articulate his reasoning so as to make a bridge between the evidence and its conclusions." *Jackson v. Astrue*, 8:08–2855–JFA, 2010 WL 500449, at *10 (D.S.C. Feb. 5, 2010) (internal quotation and citations omitted).

The ALJ first considered Plaintiff's lung impairments and whether she met a listing, which he concluded she did not. Tr. 14. In explaining the RFC determination, which included "frequent

16

exposures to fumes, odors, dusts, gases and poor ventilation," the ALJ noted that Plaintiff's medical records revealed respiratory exams that regularly noted normal breath sounds without wheezing or chest pain. Tr. 19. The ALJ further explains that despite being diagnosed with COVID-19, Plaintiff did not report shortness of breath or chest pain and her oxygen levels were not concerning. Tr. 19. At the hearing, the ALJ limited the hypothetical provided to the VE by stating the individual could not tolerate constant exposure (but could tolerate frequent exposure) to fumes, odors, dust, gases, or poor ventilation. Tr. 51. Finally, Plaintiff often denied chest pain, shortness of breath, and wheezing, despite being a smoker. *Id.* (citing B5F/9; B13F/9, 8, 12; B14F/8, 14; B19F/2; B22F/2). The ALJ adequately explained the bridge between the RFC assessment and its correlation to the evidence in the record related to Plaintiff's COPD and asthma diagnoses. Accordingly, this court finds that the ALJ's assessment of these conditions is supported by substantial evidence.

### c. ALJ's Assessment of Plaintiff's Psychiatric Disorders

Plaintiff next argues that the ALJ erred in determining that she only had moderate limitations when it came to her "ability to interact with others and concentrate, persist, and maintain pace." Pl.'s Br. 28. Plaintiff argues the ALJ ignored certain aspects of the medical record in conducting his assessment of Plaintiff's psychiatric disorders. Pl.'s Br. 28. Specifically, she argues that the record is replete with evidence showing she had an inability to regulate her emotions. Pl's Br. 28-29. Plaintiff points to places in the record indicating she had temper issues at work, she was combative or hostile with clinicians, and she suffered from panic attacks, as some examples. *Id.* The Commissioner argues that the ALJ addressed Plaintiff's mental limitations and discussed the mental examinations, explaining that taking all of the evidence into consideration, Plaintiff did not need additional mental limitations in the RFC. Def.'s Br. at 8-9.

After reviewing the record, the court finds that the ALJ properly addressed Plaintiff's mental limitations. In explaining his findings, "[a]n ALJ has the obligation to consider all relevant medical

evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding. *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). To decide if substantial evidence supports the findings, a court must view the record as a whole and consider all evidence, favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 224 (11th Cir. 1995). The ALJ found that Plaintiff had moderate limitations in both interacting with others and in her ability to concentrate, persist, or maintain pace. Tr. 15. In assessing these limitations, the ALJ explained that Plaintiff testified about shopping in stores and spending time with friends and family. *Id.* The ALJ further considered the fact that Plaintiff was described throughout her medical records as pleasant and cooperative. *Id.*

In explaining the RFC assessment, the ALJ noted that Plaintiff reported she was able to adjust to problems and was accustomed to change. Tr. 18. Moreover, the ALJ specifically discussed Plaintiff's mental impairments and found them to be severe, but not disabling. Tr. 19. Indeed, the ALJ addressed the fact that some of Plaintiff's medical records indicated that she appeared anxious and depressed or was tearful at appointments. *Id.* The ALJ explained that medical notes reflect that she had mild deficits in memory and concentration, as well as racing thoughts on occasion. *Id.* However, the ALJ also considered the fact that she was observed as cooperative, calm and pleasant. *Id.* While she reported difficulty controlling her mood, Plaintiff denied a history of anger problems, anxiety and depressive symptoms, as well. *Id.* (citing B13F/9; B6F/33; B18F/9, 10; B9F/7, 8; B5F/10; B14F/9; B6F/18). The ALJ also indicated that the record showed that Plaintiff's mental impairments were complicated by a history of inconsistent medication use and therapy. *Id.*

The ALJ limited Plaintiff's RFC to "simple, routine tasks" in an environment that was not fast-paced or otherwise had strict production demands. Tr. 16. Further, he limited Plaintiff's RFC by including only occasional contact with supervisors, co-workers and the public. *Id.* The ALJ's decision

therefore reflects an assessment that indicates he factored in her severe mental impairments, while also explaining the evidence in the record that does not support including additional limitations. Contrary to Plaintiff's allegations that the ALJ cherry-picked the evidence in the record to ignore the fact that she had a debilitating disorder, the undersigned finds that the ALJ considered all evidence within the record. Accordingly, this court finds that the ALJ's assessment of Plaintiff's psychiatric disorders is supported by substantial evidence within the record.

2.     ALJ's Evaluation of Plaintiff's Subjective Symptoms

Finally, Plaintiff argues that in evaluating Plaintiff's subjective symptoms, the ALJ erred in his assessment because the medical evidence from her amended onset date (September 27, 2018) forward does not support the ALJ's findings. Plaintiff points to evidence in the record after this date which indicates she was seen for her bipolar disorder, anxiety attacks, and panic attacks. Pl.'s Br. 32-33. She further states that she reported difficulty with sleeping and loss of appetite, as well as memory issues. Pl.'s Br. 33. As to her physical impairments, Plaintiff argues that an x-ray from December 2019 shows postsurgical changes, as well as degenerative changes to her feet, supporting her allegations of physical impairments. Pl.'s Br. 34. Plaintiff argues that she continued to complain of complications with nausea and other disorders, including her foot pain, as well as neck pain, use of a cane,[7] and fibromyalgia after this date. *Id.*

Plaintiff specifically points to a consultative exam with Dr. Pereira documenting all of the complaints she reported to this physician, including fibromyalgia; pain in her neck, arms, and hands; diarrhea multiple times daily; a diagnosis of colon cancer; muscle and joint pain; fatty liver disease; and inability to control emotions. Pl.'s Br. 35-36. During that exam, Plaintiff also indicated she received minimal treatment due to financial difficulties, while also indicating that her medications do

---

[7] Plaintiff's medical records indicate that during at least one visit, she was using a cane. Tr. 468. Plaintiff was also provided a prescription for a walker. Tr. 476.

little to alleviate her pain. Pl.'s Br. 36. Plaintiff argues that the ALJ mischaracterizes this evidence and/or does not account for evidence that supports her allegations. Pl.'s Br. 37. She argues the ALJ erred in failing to explain which of her statements undercut her allegations of pain intensity. *Id.*

The Commissioner argues that the ALJ provided an adequate discussion of Plaintiff's subjective complaints and explained why the complaints did not equate to a disabling limitation since the amended onset date. Def.'s Br. 8.

SSR 16-3p, which superseded SSR 96-7p, provides a two-step process for evaluating an individual's symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment "that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. In the second step the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities . . . ." *Id.* at *4. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id; see also* 20 C.F.R. § 404.1529(a); § 416.929(a).

This court finds the ALJ considered Plaintiff's subjective statements by using the two-step process outlined above. After discussing Plaintiff's allegations as testified to at the administrative hearing the ALJ determined that:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Tr. 17.

20

The ALJ provided several reasons to explain why the record "since the amended onset date" only partially supported Plaintiff's allegations. First, the ALJ acknowledged diagnostic evidence with respect to Plaintiff's back pain and foot pain, citing to a record that is post-amended alleged onset date. Tr. 17. The ALJ then considered the treatment records from Little River Medical Center and found it relevant that the records revealed no deficit in range of motion for Plaintiff's cervical spine, upper and lower extremities, and back. Moreover, these records indicate Plaintiff could walk without assistance. Tr. 17. The ALJ then considered the findings by other providers and found that those providers' records do not suggest the same severity or frequency of Plaintiff's allegations as she alleges. *Id.*

The ALJ pointed out that Plaintiff's own report of her symptoms within the medical records often contradicted her later complaints. Tr. 18. For example, the ALJ cites to a record from an appointment on March 31, 2020, where Plaintiff denied back pain and extremity pain. Tr. 18 (citing B14F/8). At another appointment on February 26, 2020, Plaintiff denied back problems, joint stiffness, and muscle aches, as well as denied balance difficulty, dizziness, or gait abnormalities. Tr. 18 (citing B14F/13). As to her mental impairments, as previously discussed in this order, the ALJ considered Plaintiff's psychiatric disorders and found them to be severe but explained why the record supported less restrictive limitations within the RFC.

Plaintiff specifically points to the consultative examination performed by Dr. Pereira to argue that she complained of a variety of limitations and disorders, resulting in Dr. Pereira finding that Bennett was limited in her ability to perform activities of daily living as well as her social interaction. However, the ALJ's decision reflects that he carefully considered Dr. Pereira's examination. The ALJ noted that Dr. Pereira indicated some limitations in activities of daily living and social interactions due to Plaintiff's allegations of fibromyalgia, PTSD, anxiety, depression, bipolar disorder, degenerative disease and memory loss. However, the ALJ also considered the fact that the CDI

investigation, as well as her treating providers' findings, suggested that Plaintiff may have exaggerated her symptoms at the consultative exam. Tr. 18. The ALJ further explained that Plaintiff regularly attended appointments without an assistive device, and she was frequently noted as having no ambulation issues. Tr. 18-19. While considering this exam, the ALJ also noted the discrepancy between Plaintiff's complaints of vision loss, and the fact that she had unaided 20/60 vision in her left eye and was able to obtain an unrestricted driver's license. Tr. 18.

Based on the undersigned's review of the record and applicable law, the undersigned finds that the ALJ's decision reflects that he followed the two-step process in evaluating Plaintiff's symptoms. The ALJ first determined Plaintiff's medical impairments and whether they could reasonably produce the symptoms alleged by Plaintiff, and then evaluated the intensity of those symptoms, specifically pain, to determine the extent to which Plaintiff was so limited. The ALJ also pointed to evidence in the record to support his conclusion and provided a detailed explanation, backed by evidence in the record, to support a finding that Plaintiff's symptoms were not as limiting as she alleged. Accordingly, the court finds that the ALJ properly applied SSR 16-3p and his determination regarding Plaintiff's subjective statements is supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

February 28, 2022                                                    Kaymani D. West
Florence, South Carolina                                 United States Magistrate Judge